UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARILYN BERNARD,

                    Plaintiff,

                                        : 08 Civ. 4784 (THK)

        -against-

                                        : **MEMORANDUM OPINION AND**
J.P. MORGAN CHASE BANK N.A.,            :     **ORDER**

                    Defendant.

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

    Plaintiff Marilyn Bernard ("Plaintiff") brings this action

against J.P. Morgan Chase Bank N.A., ("JPMC" or "the Bank"),

alleging gender and race discrimination and unlawful retaliation,

in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, et seq., the Civil Rights Act of 1991,

42 U.S.C. § 1981, the New York State Constitution, the New York

State Executive Law, Section 290, et seq., and the New York City

Administrative Code § 8-107.  The parties have consented to trial

before this Court, pursuant to 28 U.S.C. § 636(c).  Pretrial

discovery has been completed and presently before the Court is

Defendant's motion for summary judgment.  For the reasons that

follow, the motion is granted.

                    **FACTUAL BACKGROUND**

    Except where otherwise noted, the following facts, derived

from the parties' Statements Pursuant to Local Civil Rule 56.1, are

undisputed.

                            1

Plaintiff is a fifty-three-year-old African-American woman who was employed at JPMC and its predecessor entity, The Chase Manhattan Bank, from July 15, 1991 until January 15, 2008, when her employment terminated.  Plaintiff initially worked in the Bank's retail line of business, and was promoted to Vice-President and Manager in what was then called Workplace Financial Services ("WFS").  WFS offered companies that were customers of JPMC the opportunity to give their employees access to JPMC products and services.  In or around January of 2005, employees in WFS became National Account Representatives ("NARs") in the newly formed Chase at Work ("CAW") program, which provided similar products and services to the employees of customer companies.

The parties dispute the specific responsibilities of NARs. Defendant claims that prior to 2007, the principle job focus of an NAR was maintaining and managing existing accounts, and that in 2007, the emphasis shifted to obtaining new companies for the CAW program.  This meant that Plaintiff was responsible for retaining clients, procuring new companies for CAW, and meeting quarterly goals set by her superiors for new company acquisitions.  (See Deposition of Travis Rieger, dated Mar. 20, 2009 ("Rieger Dep.") at 38:23-25, 39:2-10; Declaration of Travis Rieger, dated July 29, 2009 ("Rieger Decl.") ¶ 9.)  Plaintiff contends that her job responsibilities never changed, and that she was always responsible for maximizing existing client accounts and acquiring new clients.

(See Affidavit of Marilyn Bernard, dated Sept. 11, 2009 ("Pl.'s Aff.") ¶ 6.)  Plaintiff concedes, however, that the most important aspect of an NAR's job is obtaining new business.  (See Deposition of Marilyn Bernard, dated Mar. 6, 2009 ("Pl.'s Dep.") at 257:9-13.)

Plaintiff was a member of one of five CAW teams, each consisting of three or four NARs and headed by a Senior NAR.  The Senior NARs reported directly to Travis Rieger, a Caucasian male who was the National Sales Director.  Starting on August 1, 2007, Plaintiff's team was led by Christine Tamney, who is a Caucasian female.  The other three NARs on Plaintiff's team were Maurice Arindell, an African-American male, Jesse Herrero, an Hispanic male, and Charlee Miller, a Caucasian female.

On or about August 20, 2007, Tamney and Rieger met with Plaintiff and gave her verbal counseling, informing her that her sales numbers were inadequate.  They sought to refocus Plaintiff and help her improve her sales performance.  Plaintiff viewed this meeting as the beginning of a steady stream of harassment and threats to her job security by Tamney and Rieger, that culminated in her dismissal.  (See Pl.'s Aff. ¶ 12.)  At the meeting, Tamney and Rieger gave Plaintiff a chart summarizing her performance in acquiring new companies for the CAW program, for the first and second quarters, as well as for part of the third quarter, through August 17, 2007.  (See Declaration of Robert S. Whitman, dated July 31, 2009 ("Whitman Decl.") Ex. H.)  Plaintiff's first quarter was

3

deemed "good" and "on target," but her second quarter performance for new company acquisitions was considered "behind pace," as she only booked seven new companies, when the targeted goal was twelve. For the third quarter, Plaintiff had booked three new companies, and was expected to enroll seven more by quarter's end. Tamney and Rieger outlined the required standards, and the steps Plaintiff could take to improve her overall performance. (See id.)

Defendant asserts that Plaintiff's performance did not improve following the meeting, and on October 29, 2007, she was given a Written Warning. (See Pl.'s Aff. Ex. M.) The Warning explained why Plaintiff's performance was substandard, and contained specific sales requirements she needed to achieve during the fourth quarter of 2007, if she wanted to continue as an NAR. It also indicated Plaintiff's sales numbers for the entire third quarter, which were significantly below the targeted number. Tamney noted in the Warning that Plaintiff had not demonstrated consistency in "re-launching" companies in her portfolio, and that Plaintiff was unable to name any companies with which she had strong, positive relationships. Additionally, the Warning stated that Plaintiff struggled with consistently acquiring new companies for CAW. It explicitly stated that if Plaintiff did not improve, she would be subject to further disciplinary action, including termination of employment. (See id.)

The Warning also stated that by the end of the fourth quarter, Plaintiff had to obtain five new companies for the CAW program, as well as five new re-launches of companies.   The acquisitions needed to comply with CAW criteria, specifically, all paperwork needed to be submitted to JPMC, and an on-site presentation by a CAW representative had to be scheduled within ninety days of the new client acquisition.   (Id.)

In response to being given the Written Warning, Plaintiff submitted a letter on November 16, 2007, claiming that she had not received proper credit for work she completed.   (See Pl.'s Aff. ¶ 33.)   She noted that she met her Demand Deposit Accounts ("DDAs") goal, which measures the number of accounts opened by employees of CAW-participating companies, for the first two quarters, and was on track to meet the third quarter target.   She believed that in light of her DDA numbers, the Warning did not fairly portray her work performance.   (See Pl.'s Aff. ¶¶ 58, 64.) Two weeks later, Plaintiff met with Tamney who explained that the Warning was based upon her low new client acquisition numbers, rather than her DDAs.   After being placed on Warning, Plaintiff did not seek help from either of her supervisors to obtain leads, or any other assistance, that would improve her sales numbers.

Plaintiff was not the only NAR to be given a Written Warning in 2007 for poor sales performance.   Like Plaintiff, Andrew Boutsikakis, a Caucasian male NAR, received a Written Warning in

October 2007. (<u>See</u> Deposition of Andrew Boutsikakis, dated Mar. 27, 2009 ("Boutsikakis Dep.") at 24:13-26:17.)  Boutsikakis responded by meeting the requirements set forth in his Warning, and went on to have one of the strongest performances of any NAR. Two other Caucasian males, Glenn Greil and James Bruner, received Warnings.  (<u>See</u> Rieger Decl. ¶ 7; Deposition of Leila McConnell, dated Mar. 27, 2009 ("McConnell Dep.") at 45:13-23.)  Neither attempted to improve their performance and each resigned shortly thereafter.  Defendant contends that had either one not achieved the targets in his Warning, his employment would have been terminated.

On December 6, 2007, Plaintiff called Lenor Chester of Employee Relations "to complain about what was happening." (<u>See</u> Pl.'s Aff. ¶ 39.)  Chester referred her to Leila McConnell, a Human Resources Business Partner at JPMC.  The next day, Plaintiff contacted McConnell.  Plaintiff told McConnell about the August verbal warning, as well as the official Written Warning.  She claimed that Tamney and Rieger were treating her "unfairly."  (<u>See</u> Pl.'s Aff. ¶ 40.)  Plaintiff states that at a later meeting she told McConnell that she was "the victim of discrimination" (<u>see</u> Pl.'s Aff. ¶ 51), but admitted at her deposition that she never told anyone at JPMC that she felt she was discriminated against because of her race or gender.  (<u>See</u> Pl.'s Dep. at 95:20-96:13.)  Plaintiff also acknowledges that

neither Tamney, Rieger, nor anyone else at JPMC ever made any remarks that indicated a racial or gender bias.  (See Pl.'s Dep. at 83:2-20, 91:10-16, 95:8-15.)

In the initial meeting with McConnell, Plaintiff claimed that the numbers used by Tamney and Rieger were inaccurate, and that she was not getting proper credit for her DDAs.  McConnell advised Plaintiff that she should address any disputes regarding her actual numbers directly with Rieger.  In mid-December 2007, McConnell again spoke with Plaintiff and reiterated that her Written Warning was based on her low numbers for new client acquisitions, and her lack of the proper skill-set for the NAR role, rather than her DDA numbers.  (See Pl.'s Dep. at 41:4-15; McConnell Dep. at 48:10-16.)

Following the initial contact with Human Resources, Plaintiff sought to transfer to another position at JPMC and asked that the Written Warning be removed from her personnel file, as it made it impossible for her to be approved for another position within the company.  (See Pl.'s Aff. ¶ 44.)  Tamney and McConnell told Plaintiff that the Written Warning would remain in her file, and McConnell advised her to look into external positions; he later forwarded to her two job postings at another bank.  (See Pl.'s Aff. ¶ 49.)

Plaintiff received her annual review on or about December 17, 2007, in which Tamney rated her overall performance as "Needs

Improvement," which meant that Tamney believed that Plaintiff was in the bottom 10% of NARs.  (See Pl.'s Aff. Ex. Z.)  The other NARs on Plaintiff's team all received a "Meets Expectations" grade in their 2007 review.  (See Pl.'s Aff. Ex. II.)

Plaintiff's review noted that Plaintiff did a good job with one particular account - Macy's - and that she should try to develop other large accounts in her portfolio.  (See id.)  As noted at the time of her verbal warning and in the Written Warning, Plaintiff's new company acquisitions were on target in the first quarter of 2007, but fell to 58% and 60% of the stated goals for the second and third quarters, respectively.  (See Pl.'s Aff. Exs. F & M.)  At the time of Plaintiff's annual review, the fourth quarter had not finished, but Plaintiff had yet to enroll any new companies.

After the New Year's holiday, Tamney and Rieger decided to terminate Plaintiff's employment, and they consulted with Human Resources, which approved the dismissal.  (See Deposition of Christine Tamney, dated Mar. 20, 2009 ("Tamney Dep.") at 20:3-21:18.)  On January 11, 2008, Tamney issued a Recommendation for Termination.  (See Pl.'s Aff. Ex. DD.)  The Recommendation stated that Plaintiff should be dismissed because she failed to meet the fourth quarter goal of signing five new companies to the CAW program.  It noted that Plaintiff claimed to have acquired three new companies, but none were referred to the CAW Sales Team or

8

Regional Sales Managers.   (Id.)   Both Tamney and Rieger
questioned Plaintiff's integrity, as none of the three companies
identified by Plaintiff confirmed their participation in the CAW
program.   The Recommendation detailed Tamney's attempts to
confirm the three purported new clients, disclosed her contact
with them, and explained how the new companies did not actually
agree to join CAW.   (Id.)   Tamney was unable to confirm that any
of the companies had agreed to participate in CAW, and to date,
none have actually joined the program.   (See Bernard Dep. at
232:15-25, 233:2-19; Rieger Decl. ¶ 11; Whitman Decl. Ex. K.)

In addition to the deficiencies noted in the Recommendation,
Rieger believed that Plaintiff was ill-suited to be an NAR, as
she did not demonstrate the aggressive salesmanship the position
required following the 2007 changes in responsibilities.   Rodney
Boldin, an African-American male who was Plaintiff's previous
supervisor, and Tamney, held similar views.   (See Rieger Decl. ¶
9.)

Plaintiff's employment was officially terminated on January
15, 2008.

## DISCUSSION

Plaintiff contends that her employment at JPMC was
terminated on the basis of her gender and race, and in
retaliation for complaints that she lodged with JPMC's Human
Resources Department.   In moving for summary judgment, Defendant

argues that (1) Plaintiff has failed to demonstrate a prima facie
case of gender or racial discrimination, or retaliation; (2) JPMC
had legitimate, non-discriminatory reasons to terminate
Plaintiff's employment as an NAR; and (3) Plaintiff cannot
sustain her burden of proving retaliation, or discrimination on
the basis of her gender or race, was a motivating factor or the
real reason behind her termination.

I.    Summary Judgment Standards

      A.    Federal Rule 56

      Under Rule 56(c) of the Federal Rules of Civil Procedure, a
motion for summary judgment may not be granted unless the Court
determines that there is no genuine issue of material fact to be
tried, and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law.  See
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548,
2552-53 (1986); Shannon v. N.Y. City Transit Auth., 332 F.3d 95,
98 (2d Cir. 2003).  The burden of demonstrating the absence of
any genuine dispute as to material facts rests upon the party
seeking summary judgment.  See Weinstock v. Columbia Univ., 224
F.3d 33, 41 (2d Cir. 2000).

      Once a properly supported motion for summary judgment has
been submitted, the burden shifts to the nonmoving party to make
a sufficient showing to establish the essential elements of the
claims on which it bears the burden of proof at trial.  See Hayut

10

v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003); Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553).  The nonmoving party must put forth "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  The nonmoving party may not rest on its pleadings and rely on mere allegations, denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).  Moreover, "[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial for in doing so he risks the possibility that there will be no trial." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (quoting Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972)).

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson, 477 U.S. at 255, 106 S. Ct. at

11

2513; McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006);

Patterson v. Cty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

When a case is fact-intensive and turns on the intent of one

party, as employment discrimination cases often do, "trial courts

must be especially chary in handing out summary judgment."

Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir.

1996); accord Feingold v. New York, 366 F.3d 138, 149 (2d Cir.

2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d

Cir. 2000), cert. denied, 530 U.S. 1261, 120 S. Ct. 2718 (2000);

Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL),

2007 WL 1552397, at *3 (S.D.N.Y. May 29, 2007). Courts are under

a duty in such cases to carefully scrutinize the record for

circumstantial evidence that could support an inference of

discrimination. See Gallo v. Prudential Residential Servs., 22

F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, even in

discrimination cases, "[c]onclusory allegations, conjecture, and

speculation . . . are insufficient to create a genuine issue of

fact." Shannon, 332 F.3d at 99 (quoting Kerzer v. Kingly Mfg.,

156 F.3d 396, 400 (2d Cir. 1998)); see also Cameron v. Cmty. Aid

for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003)

(quoting Meiri, 759 F.2d at 998). The "salutary purposes of

summary judgment — avoiding protracted, expensive and harassing

trials — apply no less to discrimination cases" than to other

types of cases. Meiri, 759 F.2d at 998; see also Abdu-Brisson v.

12

Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

> At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. A court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. A motion for summary judgment may be defeated where a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) (internal citations and quotations omitted).

II. Disparate Treatment

A. Legal Standard

The standards required to prevail on a disparate treatment claim under Title VII are well-established. Such claims are governed by the burden-shifting analysis developed by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). See, e.g., McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006); Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001). Under this framework, the plaintiff must first establish a prima facie case of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

506, 113 S. Ct. 2742, 2746-47 (1993); McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; McPherson, 457 F.3d at 215.

To establish a prima facie case of gender or race discrimination, "a claimant must demonstrate that: 1) he was within the protected . . . group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003) (internal quotation marks omitted); see also Williams v. R.H. Donnelly Corp., 368 F.3d 123, 126 (2d Cir. 2004); Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001). A plaintiff's burden is minimal in establishing a prima facie case of discrimination. See Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007) (describing the burden as "de minimis"); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 174 (2d Cir. 2005).

Once the plaintiff has carried this initial burden, the burden of production then shifts to the defendant to proffer a legitimate, non-discriminatory reason for the challenged employment action. See Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981); McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. The defendant need not prove by a

14

preponderance of the evidence that the reasons for its actions were not discriminatory; rather, the defendant must simply present clear and specific non-discriminatory reasons for its actions. See Burdine, 450 U.S. at 254-58, 101 S. Ct. at 1094-96. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against the plaintiff] remains at all times with the plaintiff." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting James v. N.Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000)).

If the defendant has presented a legitimate reason for its actions, the presumption of discrimination raised by the plaintiff's prima facie showing "drops out of the picture." Hicks, 509 U.S. at 511, 113 S. Ct. at 2749; see also Joseph, 465 F.3d at 90. The plaintiff must then be given an opportunity to demonstrate that the defendant's stated reasons are merely a pretext for discrimination. See McDonnell-Douglas, 411 U.S. at 804, 93 S. Ct. at 1825; Burdine, 450 U.S. at 253, 101 S. Ct. at 1093; Patterson, 375 F.3d at 221.

On a motion for summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); accord Feingold, 366

15

F.3d at 152. "[S]peculation alone is insufficient to defeat a motion for summary judgment." McPherson, 457 F.3d at 215 n.4. Unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination, the employer will be entitled to summary judgment. See Joseph, 465 F.3d at 90.[1]

B.  Prima Facie Case

Plaintiff clearly satisfies the first and third prongs for a prima facie case of gender and racial discrimination because she is an African-American woman, and she suffered an adverse employment action, as she lost her job as an NAR.  As set forth below, Plaintiff also satisfies the second prong.  Plaintiff does not, however, meet her burden on the fourth prong by offering evidence that gives rise to an inference of discrimination.

1.  Qualification

In order to satisfy the second prong, a plaintiff must show that she was "qualified for the position." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted); see also Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) ("To show

---

[1] The standards for claims under the New York State Executive Law largely parallel that of Title VII. See Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) ("New York courts examine [discrimination] claims under [New York State law] with the same analytical lens as corresponding Title VII-based claims."); Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) ("The standards for liability under [New York State law] are the same as those under the equivalent federal antidiscrimination laws.").

'qualification' . . . plaintiff need not show perfect performance or even an average performance. Instead, [she] need only make the minimal showing that *she possesses the basic skills necessary for performance of the job."*) (citation omitted).

While some cases have interpreted the qualification prong to mean that a plaintiff must demonstrate that before being fired she was "performing [her] duties satisfactorily," McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997), the Second Circuit has clarified the standard by explaining that the difference "between 'qualified for the position' and 'performing satisfactorily' is only a mere variation in terminology." Velez v. SES Operating Corp., No. 07 Civ. 10946 (DLC), 2009 WL 3817461 at *8 (S.D.N.Y. Nov. 12, 2009) (quoting Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001)). This means that in order to satisfy the second prong, Plaintiff need only establish basic eligibility for the position, and "not the greater showing that [she] satisfied the employer." Slattery, 248 F.3d at 92. Because the inference required by the second prong of the prima facie case "is not difficult to draw," id., it will be assumed that Plaintiff was qualified for her job since she held it for a number of years.

### 2.   Inference of Discrimination

Despite Plaintiff's "de minimis" burden, she is unable to satisfy the fourth prong of a prima facie case of either gender

or racial discrimination.  As noted, Plaintiff must present sufficient evidence demonstrating that Defendant terminated her employment under circumstances giving rise to an inference of discrimination.  See  Williams, 368 F.3d at 126; Abdu-Brisson, 239 F.3d at 466-467; Chertkova, 92 F.3d at 91.

The Second Circuit has recognized a variety of ways in which a plaintiff can show an inference of discrimination.  The inference may be drawn from:

> the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (quoting Chambers, 43 F.3d at 37-38) (internal quotation marks omitted); see also Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (inference arises when "employer subjected [employee] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group"); Chertkova, 92 F.3d at 91 (considering, inter alia, "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus [and] preferential treatment given to employees outside the protected class").

Nothing in the record reveals an inference of gender

discrimination.   Plaintiff's immediate supervisor, Tamney, is also a woman, and Plaintiff admits that Rieger, her secondary supervisor, never made any discriminatory comments relating to her gender.   (See Pl.'s Dep. at 95:8-15.)   Moreover, Charlee Miller, the other female member of her NAR team, has not faced any disciplinary action, and received a favorable 2007 annual review.   (See Pl.'s Aff. Ex. II.)   Nor does Plaintiff cite any instances of discrimination involving any other female NARs, even though half of the twenty NARs at the time were female.

In addition, Plaintiff has not presented any competent evidence showing that similarly situated male NARs were treated more favorably or were subject to different standards.   Plaintiff does not claim that she alone, among the NARs, was subject to sales goals.   Rather, she claims that other NARs failed to reach their goals, but received awards; yet, she has submitted no competent evidence to support this assertion.   To the contrary, three white male NARs were given Written Warnings during 2007 because their sales numbers were inadequate.   Two of the men resigned before their performance could be reevaluated following the Warning.   (See McConnell Dep. at 45:13-23; Rieger Dep. at 129:22-130:15.)   The other, Boutsikakis, improved his performance and reached all of the required sales targets.   (See Rieger Decl. ¶ 8; Boutsikakis Dep. at 24:13-26:17.)

Similarly, Plaintiff has failed to submit any evidence that

19

creates an inference of racial discrimination. Neither supervisor made any comment or took any action that suggests racial animus. (See Bernard Dep. at 83:2-20, 91:10-16.)    None of the circumstances surrounding Plaintiff's disciplinary proceedings, including the initial August meeting, the October Written Warning, and the decision in January 2008 to terminate her employment, support the notion that either of her supervisors considered her race when interacting with Plaintiff. See Carter v. New Venture Gear, Inc., No. 07 Civ. 393611, 2009 WL 393611, at *2 (2d Cir. Feb. 18, 2009) (finding no inference of racial discrimination where Plaintiff made no assertions that her employer contemplated race when determining her work assignments).

The other African-American NAR on Plaintiff's team, Maurice Arinndell, did not face any disciplinary proceedings during 2007; in fact, he received a favorable 2007 annual review. (See Rieger Decl. ¶ 6; Tamney Dep. at 31:20-32:3; Pl.'s Aff. Ex. II.) Additionally, as discussed, three Caucasian NARs were given Written Warnings similar to the one Plaintiff received. While the Court understands that "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law," Holcomb v. Iona, 521 F.3d 130, 141 (2d Cir. 2008), in this case the record is devoid of any evidence that would support an inference of intentional discrimination.

Because Plaintiff has failed to come forward with any evidence to support an inference of either gender or racial discrimination with respect to her dismissal from JPMC, she has failed to establish a prima facie case of discrimination.

C.   New York City Human Rights Law

Plaintiff also alleges wrongful termination on the basis of both gender and race in violation of the New York City Human Rights Law, Administrative Code § 8-107 (the "NYCHRL"). Although courts have typically evaluated such claims under the same standards applicable to Title VII and the New York State Executive Law, the enactment of the Local Civil Rights Restoration Act of 2005 has, in some respects, altered the analysis. The NYCHRL's "uniquely broad and remedial purposes ... go beyond those of counterpoint State or federal civil rights laws." Ibok v. Sec. Indus. Automation Corp., No. 05 Civ. 6584 (GBD), 2009 WL 855926, at *7 (S.D.N.Y. Mar. 26, 2009) (quoting Williams v. N.Y.C. Housing Auth., 61 A.D.3d 62, 67, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)). Federal and state civil rights law should be viewed as a "floor below which the [NYCHRL] cannot fall." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citing Restoration Act § 1) (emphasis in original). Thus, in determining whether Plaintiff's claims survive summary judgment under the NYCHRL, this Court must conduct an independent analysis. See Loeffler, 582 F.3d at 278. However, notwithstanding the enactment of the

21

Restoration Act, and the requirement of an independent analysis, courts still analyze NYCHRL claims of race and gender discrimination under the same framework as Title VII claims. <u>See</u> <u>Weiss v. J.P. Morgan Chase & Co.</u>, No. 06 Civ. 4402 (DLC), 2010 WL 114248, at * 3 (S.D.N.Y. Jan. 13, 2010); <u>see also</u> <u>Fowler v. Scores Holding Co.</u>, No. 08 Civ. 7796 (VM), 2009 WL 5178475, at * 5 (S.D.N.Y. Dec. 28, 2009) (citing <u>Leibowitz</u>, 584 F.3d at 498 n.1).

As with Plaintiff's Title VII and New York State law claims, Plaintiff's NYCHRL gender and racial discrimination claims cannot succeed.  Section 8-107 of the NYCHRL prohibits employers from, among other things, discharging employees because of their race or gender.  <u>See</u> NYCHRL § 8-107.  Thus, in order to establish liability, Plaintiff must show "by a preponderance of the evidence that she has been treated less well than other employees" because of her gender or race.  <u>See</u> <u>Sealy v. Hertz Corp.</u>, No. 08 Civ. 1634 (GBD), 2009 WL 2591390, at *8 (S.D.N.Y. Aug. 21, 2009) (citing <u>Williams</u>, 61 A.D.3d at 78, 872 N.Y.S.2d at 39).

As discussed, Plaintiff has presented no competent evidence showing discriminatory animus by either of her supervisors, that would support her claim that she was unlawfully discriminated against.  Nor does the record show that Plaintiff was subject to higher standards, or a different review process, or was otherwise treated less well, than her fellow employees.  Because nothing in the record gives rise to an inference of discrimination, even

under the more expansive protection of the NYCHRL, no reasonable juror could conclude that Plaintiff's race or gender was a motivating factor in her termination.

D.    Legitimate Non-Discriminatory Reason to Terminate

Assuming, arguendo, that Plaintiff established a prima facie case of discrimination, Plaintiff still cannot prevail on her gender and racial discrimination claims because Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination, that has not been shown to be a pretext for discrimination.  See Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs, 450 U.S. at 253, 101 S. Ct. at 1093; McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.

According to Defendant, Plaintiff failed to meet the clearly established sales goals for the fourth quarter of 2007.  It is not the Court's role to second-guess this justification or evaluate its credibility.  Instead, the relevant standard of review is whether the defendant introduced evidence that, "taken as true, would permit the conclusion that there was a non-discriminatory reason."  Holcomb, 521 F.3d at 141 (quoting St. Mary's, 509 U.S. at 509, 113 S. Ct. 2742).  As the Supreme Court has noted, "[t]his burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing, 530 U.S. 133, 148, 120 S. Ct. 2097, 2106 (2000) (quoting St. Mary's, 509 U.S. at 509, 113 S. Ct. 2742).

Here, Defendant provided testimony from Plaintiff's superiors, the Written Warning, her annual review, and the termination memo, which all indicate that Plaintiff's employment was terminated because she did not reach the specified sales benchmarks for the fourth quarter of 2007.  Since the proffered evidence, if true, would be a legitimate and non-discriminatory basis for Defendant's conduct, Defendant has met its burden.

E.   Pretext

Plaintiff is unable to show that Defendant's proffered reason for terminating her employment is a pretext for discrimination. See Leibowitz, 584 F.3d at 504; D'Cunha v. Genovese/Eckerd Corp., 479 F.3d 193, 196 (2d Cir. 2007); Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (all stating that when a defendant offers a legitimate reason for terminating a plaintiff's employment, the burden shifts back to the plaintiff to persuade the court that the defendant had discriminatory intent).  As the Second Circuit has explained, "[t]he Plaintiff must produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" Weinstock, 224 F.3d at 42 (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994)).

An employee can show that a defendant's justification is a

24

pretext for unlawful discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Weiss v. JP Morgan Chase & Co., 332 F. App'x 659, 661 (2d Cir. 2009) (quoting Burdine, 450 U.S. at 256, 101 S.Ct. at 1089). Here, Plaintiff has not come forward with any evidence that would support the contention that JPMC's decision to terminate her employment was most likely motivated by discrimination, rather than her inability to meet new company acquisition goals; nor has she discredited Defendant's proffered reason for her termination.

Plaintiff clearly failed to meet the fourth quarter sales targets established by her supervisors. Tamney and Rieger articulated performance objectives for obtaining new business, and Plaintiff did not satisfy them. Plaintiff was fully aware that her supervisors were dissatisfied with her sales performance. Beginning with the August 2007 meeting, they expressed concern with Plaintiff's work, specifically, her inability to meet the required number of new client acquisitions. (See Pl.'s Aff. Ex. M.) At the meeting, both supervisors informed Plaintiff that her sales numbers were inadequate, as her second quarter new company acquisitions were only 58% of the required amount, and her third quarter numbers were also below target. They indicated that improvement was necessary, and outlined steps Plaintiff needed to

25

take to improve her performance.  (Id.)

When Plaintiff failed to increase her sales activity, Tamney and Rieger gave her the Written Warning.  The Warning noted that Plaintiff was not consistently launching new companies in her portfolio, nor acquiring new companies for CAW.  It also stated that she had poor relationships with leaders of businesses ("LOBs").  Moreover, it set out sales objectives for the fourth quarter that Plaintiff needed to accomplish, and specifically stated that if she failed to improve, she would be subject to further discipline or termination.  (Id.)  Plaintiff clearly had an opportunity to improve her job performance.  Cf. Weiss, 332 F. App'x at 664 (noting that an inference of pretext may arise when an employer deviates from typical procedure and fails to provide an employee with the opportunity to correct alleged problems with his job performance).

The Warning required Plaintiff to enroll five new companies in CAW, in the fourth quarter of 2007, in compliance with CAW guidelines.  Notwithstanding Plaintiff's claim that she enrolled three new companies, the evidence submitted fully supports Defendant's contention that Plaintiff failed to enroll any new companies following the Warning.  (See Defendant's Rule 56.1 Statement ("Def.'s 56.1") ¶¶ 17-19.)  Although Plaintiff has submitted email chains from December 7, 2007, which show contacts with two companies, Jerrilyn Askew ("Askew") from Hail Celestial,

and Cheryl Phillips ("Phillips") from Fannie Mae, neither company agreed to join the program. (See Pl.'s Aff. Exs. W & X.)  Tamney asked Plaintiff for the on-site dates for the purported newly-signed companies, and Plaintiff responded saying that she needed to call back in January to schedule on-site appointments.[2]  (See Pl.'s Aff. Ex. Y.)

On January 9, 2008, Tamney emailed McConnell and Rieger summarizing Plaintiff's fourth quarter performance. (See Whitman Decl. Ex. K.)  The email details Tamney's attempts to confirm the three new companies Plaintiff claimed to have enrolled in CAW. Tamney called Town Sports International, and left four messages over a three-week period, and never received a response.  She spoke directly with Askew at Hail Celestial, who stated that "nothing is definite yet," and did not seem excited about CAW. When Tamney spoke with Phillips at Fannie Mae, she was told to call back in February of 2008.  (Id.)

Ultimately, none of the three companies joined the program, leading Rieger to question Plaintiff's credibility and integrity, by taking credit for obtaining clients that had not actually agreed to participate in CAW. (See Rieger Decl. ¶ 11.)  Thus, Plaintiff fell significantly short of her employer's expectations, set forth in the Warning, compounded matters with respect to her

---

[2] Even if these companies had scheduled on-site appointments in January and ultimately enrolled in CAW, Plaintiff would still not have met the requirement that she enroll five new companies.

27

credibility by falsely claiming to have enrolled new companies.

Plaintiff asserts that her colleagues also failed to meet their fourth quarter goals, (see Plaintiff's Rule 56 Statement ("Pl.'s 56.1") ¶¶ 99-101), but nothing in the record supports that contention.   Nor is there evidence that demonstrates that Defendant's claims about Plaintiff's fourth quarter performance were inaccurate or "were in fact a coverup for a racially discriminatory decision." St. Mary's, 590 U.S. at 518, 113 S. Ct. at 2753 (quoting McDonnell Douglas, 411 U.S. at 805, 93 S. Ct. at 1825, n.18).  Plaintiff has submitted the 2007 annual reviews for the three other NARs on her team, all of whom received a grade of "Meets Expectations."  (See Pl.'s Aff. Ex. II.)  The reviews, however, do not contain specific information on the acquisitions of new companies, and, thus, they do not support Plaintiff's position.[3]

Moreover, the record does not show that Plaintiff was held to a different standard than similarly situated NARs when she was counseled and given a Written Warning.  The decision to hold the August 2007 meeting was made following Plaintiff's disappointing second quarter sales results and a sluggish beginning to the third quarter. (See Pl.'s Aff. Ex. F.)  Tamney became team leader three weeks prior to the meeting, and she felt that Plaintiff needed to

---

[3]  Neither Plaintiff nor Defendant submitted documentation comparing the new client acquisitions among NARs on a quarterly basis, or for the entirety of the last three quarters of 2007.

improve her sales.  (See Tamney Dep. at 12:23-25, 13:2-9, 22:24-25, 23:2, 26:17-22.)  Holding a meeting to convey that message, and to offer suggestions, does not give rise to an inference of discrimination.  Additionally, there is no evidence that other NARs similarly performed below expectations and did not receive a verbal warning.

Plaintiff believes the meeting was not warranted because she was actually meeting her third quarter goals, and even if she was not, other NARs fell short as well.  (See Pl.'s 56.1 ¶¶ 57, 61.)  As support, she cites her own affidavit, which states that "My numbers were not inadequate.  In fact, my numbers compared favorably with the other NARs . . . Some NARs who failed to meet their goals received awards."  (Pl.'s Aff. ¶¶ 18, 21.)  These allegations are conclusory, are not supported by competent evidence, and are therefore insufficient to create a genuine issue of material fact.  See Holcomb, 521 F.3d at 137; see also Edwards v. City of N.Y., No. 03 Civ. 9407 (PAC), 2005 WL 3466009, at *16 (S.D.N.Y. Dec. 19, 2005) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)).  To defeat a summary judgment motion, a plaintiff "must offer some hard evidence showing that [her] version of the events is not wholly fanciful."  D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998) (emphasis added).  Plaintiff has not produced competent evidence indicating that she was singled out in receiving a verbal warning, because of her race

29

or gender, rather than because her superiors believed that she needed to acquire more clients.

Nor has Plaintiff offered competent evidence, such as affidavits from other NARs, or JPMC business records, which supports her contention that in being given a Written Warning, she was treated differently than similarly situated NARs.  As mentioned, three white male NARs also received Written Warnings, and the other female on Plaintiff's team received a favorable review for 2007, as did the African-American male.

In further support of her claim, Plaintiff contends that her third quarter new client acquisitions and DDA numbers were on par with top performers.[4]  She has submitted a PowerPoint slide displayed at a national sales meeting in November 2007, in which Defendant listed the top performing NARs for new company acquisitions and DDA accounts in the third quarter of 2007.  (See Pl.'s Aff. Ex. T.)  Since, according to the slide, the three top performing NARs during the quarter obtained twelve and eleven new companies respectively, and Plaintiff obtained nine new companies

---

[4] Defendant believes that Plaintiff's third quarter results are irrelevant, since Plaintiff was terminated because of her failure to meet fourth quarter goals.  However, if the record contains circumstantial evidence from prior quarters indicating Plaintiff was evaluated differently than her fellow NARs, that could give rise to an inference of discrimination.  See Reeves, 530 U.S. at 141, 120 S. Ct. at 2105.  The Court must scrutinize the record for any evidence of intentional discrimination, as "smoking gun evidence of discriminatory intent is rare and must often be inferred."  Forsyth v. Fed'n Employment & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005).

during the same period, Plaintiff believes her performance was not significantly inferior to the top performers.

Even if Plaintiff's third quarter new acquisition results placed her fourth among her peers (assuming she had the next highest total number of new client acquisitions), this would not support an inference of discrimination or demonstrate that Defendant's termination of Plaintiff's employment was discriminatory.  There is no evidence in the record showing that the remaining NARs who were not among the top three performers, had fewer new acquisitions than Plaintiff did in the third quarter or, if they did, how many fewer.  Moreover, Plaintiff's second quarter results did not meet expectations, and her fourth quarter results failed to come close to meeting expectations.  Plaintiff does not point to anyone who was similarly situated to her in that respect, who was treated less harshly.

Plaintiff also argues that DDAs are more important in assessing an NAR's performance than Defendant acknowledges; she believes that there was a dual focus on DDAs and new client acquisitions.  She points out that Tamney discussed DDA numbers in Plaintiff's Written Warning: "[A] closer review of her portfolio reveals that a significant portion 2,451 or (37%) of Marilyn's YTD DDA production comes from one company Macys."  (See Pl.'s Aff. Ex.

31

M.)[5]  Additionally, DDAs were cited at a national sales meeting. (See Pl.'s Aff. Ex. T.)  Plaintiff finished third in DDA accounts for the third quarter of 2007, and her year-end total ranked her second.  (See Pl.'s 56.1 ¶ 64.)

Nevertheless, Defendant informed Plaintiff on multiple occasions that her DDAs had nothing to do with her discipline or her dismissal from JPMC.  (See Pl.'s Dep. at 111:4-15; Pl.'s Aff. Exs. M, DD; McConnell Dep. at 48:10-16.)  While DDAs may have been one factor used in evaluating NARs, nothing prohibited Defendant from placing a greater emphasis on new client acquisitions. Plaintiff concedes that acquiring new companies was the most important part of her job responsibilities, and thus, Defendant did not simply create a bogus justification for its dissatisfaction with Plaintiff's job performance.  Additionally, three other NARs received Written Warnings during 2007 for inadequate sales performance, that is, for not acquiring a sufficient number of new companies for the program.

Plaintiff cites Reeves v. Sanderson Plumbing, 530 U.S. 133, 120 S. Ct. 2097 (2000), in support of the proposition that a jury can find a Defendant unlawfully discriminated when the employer's asserted justification for its actions is false.  However, a finding that the asserted justification is false must be supported

---

[5] Even if this reference to DDAs demonstrates Defendant's interest in DDAs, it is hardly complimentary to Plaintiff.

by a prima facie case of discrimination, in order to conclude that
the employer's proffered reason was a pretext for discrimination.
See Reeves, 530 U.S. at 147, 120 S. Ct. at 2108.   In this case,
Plaintiff  has  done  neither.    She  has  failed  to  show  that
Defendant's proffered reason for her dismissal was false, or that
Plaintiff's termination occurred under circumstances giving rise
to an inference of race or gender discrimination.

     Based  on  the  repeated  attempts  by  Defendant  to  inform
Plaintiff  that  she  needed  to  improve  her  sales  figures,  the
similar  warnings  given  to  three  white  male  NARs,  Plaintiff's
failure to acquire any new companies during the fourth quarter of
2007, coupled with the absence of any evidence of discriminatory
animus,  no  reasonable  juror  could  conclude  that  Defendant's
proffered  reason  for  terminating  Plaintiff's  employment  was  a
pretext for discrimination.  Accordingly, Defendant is entitled to
summary judgment on Plaintiff's discrimination claims.

III. Unlawful Retaliation

     Plaintiff claims that Defendant terminated her employment in
retaliation  for  complaints  she  made  to  JPMC's  Human  Resources
Department, in violation of Title VII, the New York State Human
Rights Law, and the New York City Human Rights Law.   Because
Plaintiff  cannot  demonstrate  a  prima  facie  case  of  unlawful
retaliation, her retaliation claim must be dismissed.

     A.   Legal Standards

33

Title VII forbids discrimination against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the auspices of that statute. 42 U.S.C. § 2000e-3(a); see also Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir. 2001). As with the burden-shifting analysis applied to discrimination claims, an employee must first demonstrate a prima facie case of retaliation, after which a presumption of retaliation arises. The employer must then articulate a legitimate, non-retaliatory reason for the adverse employment action, and the employee then must show that unlawful retaliation played a part in the adverse employment action. See Jute, 420 F.3d at 173; Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001); Quinn, 159 F.3d at 768; Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 115 F.3d 116, 120-21 (2d Cir. 1997).

In the end, "[t]he ultimate burden of persuasion, of course, remains with the plaintiff. . . . The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally . . . retaliated against the plaintiff for engaging in protected activity." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990) (internal citations omitted).

In order to demonstrate a prima facie case of retaliation

34

under Title VII, a plaintiff must produce evidence sufficient to permit a reasonable trier of fact to conclude: "(1) that [the plaintiff] engaged in protected [activity] under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff,[6] and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citing Cifra, 252 F.3d at 216).  The retaliatory motive need not be the sole cause; "if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." Hicks v. Baines, No. 06-3782-cv, 2010 WL 346710, at *3 (2d Cir. Feb. 2, 2010) (citations omitted).

Although the burden that a plaintiff must meet at the prima facie stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a retaliatory motive. See Jute, 420 F.3d at 173; Donahue v. Windsor Locks Bd. of Fire

---

[6] While the Local Civil Rights Restoration Act of 2005 makes clear that the adverse action standard applied to retaliation claims under the NYCHRL is less stringent than that required under federal law, see Williams, 61 A.D.3d at 7071, 872 N.Y.S.2d at 34, that aspect of Plaintiff's retaliation claim is not in dispute, and the Title VII framework still applies.

Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987).   "The plaintiff can establish the causal connection indirectly by showing that the protected activity was closely followed by discrimination, or directly by showing evidence of discriminatory animus."   Butts v. N.Y.C. Dep't. Of Hous. Pres. and Dev., No. 07 Civ. 1930, 2009 WL 190403, at *3 (2d Cir. Jan. 28, 2009) (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).   For an employment action to be disadvantageous, and thus retaliatory, it must be of a character likely to dissuade "a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409 (2006).

   B.   Application

   Plaintiff contends that Defendant unlawfully terminated her employment in response to her complaints to Human Resources regarding her alleged unfair treatment.   Plaintiff cannot show any causal connection between her complaints and her termination, and therefore, she cannot demonstrate a prima facie case of retaliation.   Even assuming Plaintiff could meet her burden, Defendant has demonstrated a legitimate, non-discriminatory reason for the adverse employment action, namely Plaintiff's poor performance, which Plaintiff has not rebutted with competent evidence.

   To prove her prima facie case, Plaintiff must first show that

36

she participated in a protected activity.  See Shah v. N.Y. State
Dep't. Of Civil Serv., No. 01 Civ. 9009, 2009 WL 1868567, at *1
(2d Cir. June 30, 2009); Distasio v. Perkin Elmer Corp., 157 F.3d
55, 66 (2d Cir. 1998).   To show that an activity is protected, a
plaintiff  need  not  prove  the  merit  of  the  underlying
discrimination complaint; rather, she need only show that she was
acting under a good faith belief that the activity was of the kind
covered by the statute.  Cosgrove, 9 F.3d at 1039 (citing Sumner,
899 F.2d at 209).  Activities that are considered protected do not
just include the filing of formal discrimination charges; informal
protests, including making complaints to management, are protected
activities.  Sumner, 899 F.2d at 209.

     Here,  there  is  some  question  about  whether  Plaintiff
participated in a protected activity.  Following a few months of
disciplinary warnings, Plaintiff contacted Human Resources, on
December 6, 2007, to complain that she was being treated unfairly.
The  following  day she  spoke  directly  with  McConnell.   A week
later, Plaintiff claims that she told McConnell she felt that she
was the victim of discrimination, and one month later she was
fired. (See Pl.'s Aff. ¶ 51.)  However, Plaintiff's own deposition
testimony  is  inconsistent  with  her  present  claim;  Plaintiff
admitted at her deposition that she never told anyone at JPMC that
she felt she was being discriminated against.  (See Pl.'s Dep. at
95:20-96:13.)  "Factual allegations that might otherwise defeat a

motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony." Cordell v. Verizon Commc'ns, Inc., 331 F. App'x 56, 58 (2d Cir. 2009) (citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).

Moreover, it is doubtful that Plaintiff's earlier complaint to McConnell that she was being treated "unfairly," constitutes a protected activity. A vague complaint about unfair treatment does not necessarily put an employer on notice that an employee believes she is being discriminated against because of her race or gender. See Krasner v. HSH Nordbank AG, No. 08 Civ. 8499 (GEL), 2010 WL 86845, at * 13 (S.D.N.Y. Jan. 7, 2010); Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. Jan. 11, 2007).

Nevertheless, drawing all inferences in Plaintiff's favor, the Court will assume for the purposes of this motion that Plaintiff participated in a protected activity.

Assuming Plaintiff alerted McConnell to her claim of racial or gender discrimination, Plaintiff has also satisfied the knowledge requirement of a prima facie case. Although Defendant argues that neither Tamney nor Rieger was aware of Plaintiff's complaints, Plaintiff need not show anything more than general corporate knowledge that she engaged in a protected activity. See

<u>Triola v. Snow</u>, 289 F. App'x 414, 417 (2d Cir. 2008) (citing
<u>Patane</u>, 508 F.3d at 115).  The knowledge requirement is satisfied
when a "plaintiff has complained directly" to another employee
"whose job it was to investigate and resolve such complaints."
<u>Patane</u>, 508 F.3d at 155.  McConnell is a Human Resources Business
Partner whose job responsibility is to investigate complaints made
by employees, as evidenced by Plaintiff's being referred to her
when she initially decided to complain about her supervisors.
Since Plaintiff complained to McConnell that she was being treated
unfairly, Defendant clearly knew of the protected activity, and,
therefore, Plaintiff has satisfied the second element of a <u>prima
facie</u> case.

    As Plaintiff's employment was terminated, she has also
demonstrated that Defendant took an adverse employment action
against her.

    Nevertheless, Plaintiff cannot show a causal connection
between her complaint to Human Resources and her termination.
Plaintiff argues that her dismissal occurred just over a month
after her first contact with Human Resources, when she complained
that she was being treated unfairly.  (<u>See</u> Pl.'s 56.1  ¶¶ 80,
103.)  The Second Circuit has confirmed, however, that where
"timing is the only basis for a claim of retaliation, and gradual
adverse job actions began well before the plaintiff had ever
engaged in any protected activity, an inference of retaliation

does not arise." Debbs v. Alstom Transp., Inc., No. 08 Civ. 2602, 2009 WL 3004088, at *3 (2d Cir. Sept. 21, 2009) (quoting Slattery, 248 F.3d at 95).

The preliminary steps leading to Plaintiff's termination had begun months prior to her first discussion with McConnell. Tamney and Rieger warned Plaintiff in August 2007 about her sales numbers; Plaintiff was given a Written Warning in October 2007; and she had multiple conversations with Tamney about the need to improve her new company acquisitions. Indeed, Plaintiff acknowledges that the discipline began months before her complaint to Human Resources. "I felt that, you know, that my termination was pretty much set from when I had my verbal [warning]." (Pl.'s Dep. at 146:8-18).

When discipline or expressed dissatisfaction with job performance has taken place before the plaintiff engages in a protected activity, a causal nexus does not exist between the protected activity and a subsequent adverse action. Otherwise, an employer who institutes progressive discipline would never be free of a claim of retaliation, so long as the employee complained about unfairness. See Slattery, 248 F.3d at 95; Luxembourg v. Guardian Life Ins. Co., No. 02 Civ. 9116 (SAS), 2004 WL 385116, at *5 (S.D.N.Y. Mar. 2, 2004).

Because Defendant's warnings and disciplinary proceedings against Plaintiff clearly began prior to her engaging in any

40

protected activity, Plaintiff cannot show a causal connection between her complaints and the termination of her employment.   It follows that Plaintiff cannot establish a prima facie case of unlawful retaliation.  In any event, and as discussed with respect to Plaintiff's discrimination claims, Defendant has demonstrated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, and there is no evidence in the record that would allow a reasonable fact-finder to conclude that unlawful retaliation was a motivating factor behind Defendant's actions.  Defendant is, therefore, entitled to summary judgment on Plaintiff's retaliation claim.

### CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is granted, and this case is dismissed with prejudice.

So Ordered.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:     February 5, 2010
           New York, New York

41